# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| SONIA MOTT, | CASE NO. 1:21-cv-00010 |
| Plaintiff, | DISTRICT JUDGE DAN AARON POLSTER |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Sonia Mott ("Plaintiff" or "Ms. Mott") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits (DIB).  (ECF Doc. 1, ECF Doc. 15.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.      Procedural History

Ms. Mott filed her application for DIB on August 10, 2018.  (Tr. 10, 82, 168-69.)  She asserted a disability onset date of March 6, 2018.  (Tr. 10, 168, 300.)  She alleged disability due to fibromyalgia, arthritis in spine, spondylitis, depression, anxiety, and patella femoral syndrome. (Tr. 67, 84, 104, 113, 300.)   Her application was denied at the initial level (Tr. 103-11) and upon

reconsideration (Tr. 113-19).  She then requested a hearing.  (Tr. 120-21.)  A hearing was held before an Administrative Law Judge ("ALJ") on April 23, 2020.  (Tr. 38-65.)

On May 27, 2020, the ALJ issued an unfavorable decision, finding Ms. Mott had not been under a disability from March 6, 2018 through the date of the decision.  (Tr. 7-28.)  Ms. Mott requested review of the ALJ's decision by the Appeals Council.  (Tr. 165-67.)  On November 3, 2020, the Appeals Council denied Ms. Mott's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Mott was born in 1970.  (Tr. 22, 47, 168.)  She has a high school education and attended three years of college at a community college.  (Tr. 301, 847.)  She worked full time in the positions of customer service manager and retail store manager from 1999 until 2014, and then worked reduced hours until 2018.  (Tr. 47-48, 60.)

### B.    Medical Evidence

#### 1.    Treatment History

##### i.    Physical Impairments

Ms. Mott fell and was injured at work in November 2017, resulting in allowed workers compensation claims for bilateral knee contusions, bilateral knee sprains, and lumbar sprain. (Tr. 602-03, 716.)  An MRI of the right knee was taken on December 7, 2017, showing: full thickness chondral defect involving the medial patellar facet associated with subchondral cystic change in edema with need to correlate for history of transient lateral patellar dislocation, small bone contusion of the inferior medial aspect of the medial femoral condyle, and mild hyperintensity in the superolateral aspect of Hoffa's fat that may relate to fat pad impingement

2

syndrome.  (Tr. 766-67.)  She received chiropractic and orthopedic treatment and physical therapy for her work-related injuries throughout the end of 2017 and into 2018.  (Tr. 719-20; *see generally* Tr. 600-844.)  Her orthopedic doctor, David Marsh, M.D. with University Hospitals Elyria Medical Center, diagnosed her with patellofemoral syndrome.  (Tr. 719, 721, 738, 744.)

Ms. Mott saw her primary care physician Digna Moya, M.D. at the Cleveland Clinic on February 2, 2018, complaining of low back pain, which she felt after repeatedly bending over. (Tr. 827.)  She reported that her acid reflux symptoms had improved, and she was taking Nexium less often.  (*Id*.)  On examination, she displayed mild tenderness in the paravertebral muscles in the lower thoracic area.  (*Id*.)  A February 2018 x-ray of the low back was normal.  (Tr. 436-37.)

On March 8, 2018, she saw neurologist Sanjay Parikh, M.D. of University Hospitals for a six-month follow up for restless leg syndrome ("RLS") with depression, anxiety, and chronic back pain.  (Tr. 574-77.)  Examination findings were normal except for an unsteady/ataxic gait because of the brace she wore on the right knee.  (Tr. 574, 576.)  Dr. Parikh renewed her prescriptions of Lexapro and Klonopin for anxiety and RLS.  (Tr. 576.)

When Ms. Mott saw Dr. Moya on May 15, 2018 for a routine follow up, Dr. Moya noted that she was seeing Dr. Parikh for fibromyalgia and RLS, and orthopedics for her knee.  (Tr. 432, 434.)  She complained of a migraine, stating that she had migraines in the past, but they were lasting longer.  (Tr. 432.)  Specifically, she reported headaches once a week, causing throbbing/stabbing pain that lasted two to three days.  (*Id*.)  She denied light sensitivity but reported some sensitivity to noise.  (*Id*.)  She indicated that she took Tylenol and would lie down when she had a headache.  (*Id*.)  She also complained of numbness in her knees, and epigastric pain for which she was restarting Nexium.  (*Id*.)  On examination, she had no musculoskeletal edema, and her gait was normal, but she wore a knee brace on the right.  (Tr. 434.)  She

3

demonstrated tenderness in the epigastric area.  (*Id*.)  She was on steroids and taking ibuprofen for her knee, but Dr. Moya noted that she might have to stop the medication because of the concern over a peptic ulcer.  (Tr. 434.)

Ms. Mott returned to primary care on August 16, 2018 for an annual exam, complaining of pain in her fingers, stiffness in her hands, gastric pain that was radiating to her side, increased bowel urgency, feeling nauseous, and worsening anxiety.  (Tr. 418.)  She reported getting around a little better since her fall in November, and that her heartburn was better.  (*Id*.)  Examination findings were normal, including normal gait, good range of motion, and no swelling in the fingers.  (Tr. 420-21.)  Dr. Moya recommended additional testing/labs due to unspecified joint pain and fatigue, and encouraged Ms. Mott to exercise and to try aquatic exercises.  (Tr. 422.)  Ms. Mott reported she was afraid of being in the water.  (*Id*.)  Dr. Moya considered switching Ms. Mott to Cymbalta for her aches and pains, but did not do so after being reminded that she had side effects in the past when on Cymbalta.  (*Id*.)

On August 20, 2018, Ms. Mott returned to neurology, complaining of headaches both before going to bed and when waking up.  (Tr. 570.)  On examination, she had an ataxic gait due to pain in the knee and legs.  (Tr. 572.)   Exam findings were otherwise normal.  (*Id.*)  Dr. Parikh continued Ms. Mott on Klonopin and Lexapro for RLS and anxiety, and started her on Qudexy for tension headaches.  (Tr. 573.)

An MRI of Ms. Mott's lumbar spine dated September 5, 2018, ordered by her chiropractor Brian Studer, D.C. of the Lorain Injury Center, showed lumbar disc bulges without spinal stenosis or nerve root compression (Tr. 407.)

Ms. Mott returned to primary care on September 12, 2018.  (Tr. 413.)  She complained of her usual aches from fibromyalgia but also reported more pain and stiffness in her hands.  (*Id*.)

4

Examination showed good range of motion of the fingers and no swelling in the hands, but some tenderness in the left TMJ.  (Tr. 414.)  She had a normal gait.  (*Id*.)

Ms. Mott was evaluated by Robert Mark Fumich, M.D. on September 13, 2018 regarding her work-related injuries. (Tr. 716.)  She reported no prior injury or problems with her knee. (*Id*.)  She complained of bilateral knee swelling and knee pain with stairs, especially going down the stairs.  (*Id*.)  She reported that her treatment had included braces, physical therapy, and viscosupplementation injections in both knees.  (*Id*.)  On examination, Dr. Fumich observed crepitus and medial and lateral joint line tenderness in both knees and slight effusion in the left knee, but with a full range of motion and no instability in the knees.  (*Id*.)  Dr. Fumich indicated she had failed conservative treatment and needed arthroscopy.  (*Id*.)  Dr. Fumich also indicated that her "recognized condition of contusion or sprain [had] caused a substantial aggravation of arthritis in her right knee as documented by the MRI and bone contusion seen" and he planned to "request the additional allowances of substantial aggravation and internal derangement for each knee" and authorization for arthroscopy of both knees.  (*Id*.; Tr. 766-67.)

Ms. Mott returned to neurology on November 19, 2018 for follow up regarding migraines, chronic pain syndrome, and restless leg syndrome.  (Tr. 566.)   She reported that she stopped her headache medication after about two weeks, stating "she now ha[d] numbness in [her] hands and her jaw hurt[] her badly."  (*Id*.)  Examination findings were generally normal, except for an unsteady/ataxic gait because of the brace she wore on the right knee.  (Tr. 568.)  She continued to complain of swelling in the hands and aches and pains in the jaw and shoulder. (Tr. 566.)  Dr. Parikh observed that her physical and neurological exam was nonfocal except for some swelling in the hands.  (*Id*.)  He continued her on Klonopin and Lexapro for RLS and

anxiety, stopped Quinidex, and indicated she agreed to see a rheumatologist to look for any other etiology and return in six months.  (Tr. 566, 569.)

On December 19, 2018, Ms. Mott had a cervical spine MRI due to neck pain.  (Tr. 599.) The impression was: left paracentral bulging disc at C5/6, posterior disc bulge at T1-T2, cervical lordotic straightening, and congenitally small spinal canal.  (*Id*.)

On December 18, 2018, Ms. Mott retuned to Dr. Fumich regarding her right knee.  (Tr. 604.)  Dr. Fumich indicated: "On physical examination of the right knee, she has continued pain. She has crepitus on flexion/extension.  She has medial joint tenderness, lateral joint tenderness. She has full motion.  There is a slight effusion.  She has no instability."  (*Id*.)  At her next appointment on January 22, 2019, examination showed "continued symptomatic right knee" with "medial tenderness, lateral tenderness, [and] crepitus on flexion/extension," with "slight effusion" and "no instability."  (Tr. 604.)  (*Id*.)

Ms. Mott returned to Dr. Fumich on February 19, 2019, continuing to complain of bilateral knee pain.  (Tr. 605.)  On examination of the right knee, there was "crepitus, medial tenderness, [and] lateral tenderness" and "slight effusion" but no instability and full range of motion.  (*Id*.)  In the left knee, there was "medial and lateral discomfort," "crepitus," and "slight effusion," but no instability.  (*Id*.)  When Ms. Mott returned to Dr. Fumich on March 26, 2019, examination findings were the same.  (Tr. 1023.)  Dr. Fumich noted Ms. Mott had "failed viscosupplementation injections, bracing and therapy" and that he was waiting for authorization for knee arthroscopy.  (*Id*.)  During a May 7, 2019, visit with Dr. Fumich, Ms. Mott reported that she was not approved for surgery through workers compensation, but wanted to use her private insurance and proceed with arthroscopy.  (Tr. 1024.)

6

Ms. Mott returned to neurology on May 20, 2019 for follow up regarding her migraines and RLS with chronic pain syndrome.  (Tr. 1070.)  She reported no changes and indicated her medication was effective, stating she was doing very well on Klonopin.  (*Id*.)  Examination showed: normal gait without spasticity, ataxia, or bradykinesia and normal stance.  (Tr. 1074.)  She was continued on Klonopin for RLS.  (*Id.*)

Ms. Mott had right knee arthroscopy on May 29, 2019.  (Tr. 1024.)  When she returned to Dr. Fumich on July 9, 2019 for a post-operative visit, she reported a little stiffness in her right knee, but no pain or discomfort.  (Tr. 1025.)  Dr. Fumich observed that the right knee was "doing quite well," with no effusion and a full range of motion, but her left knee was "symptomatic" with some joint line discomfort to palpation and crepitus on flexion/extension but no effusion. (*Id.*)  He recommended a left knee arthroscopy, noting that he did not believe an MRI would be helpful.  (*Id.*)  Ms. Mott underwent a left knee arthroscopy on July 31, 2019.  (*Id*.)  While some effusion was observed at a post-operative visit in August 2019, she demonstrated a full range of motion in the left knee with no effusion by September 2019, and her "preoperative pain" was "gone."  (Tr. 1026.)  She was discharged, with instructions to return as needed.  (*Id.*)

When Ms. Mott returned to neurology on November 20, 2019 for follow up regarding RLS with a history of chronic headaches and encephalopathy due to anxiety, she reported that her medications were still effective and she needed refills.  (Tr. 1075.)  She reported doing very well on Klonopin, and taking Effexor from her primary care provider.  (*Id*.)  Examination findings were normal.  (Tr. 1077-78.)  She was continued on Klonopin for RLS, with a note that she was taking Effexor for anxiety.  (Tr. 1078.)  Dr. Parikh again noted that he had stopped the Qudexy prescription for tension headaches.  (*Id*.)

### ii.       Mental Health Impairments

Prior to her alleged onset date of March 6, 2018, Ms. Mott presented for an initial psychiatric assessment by Christine Mizen, LISW at "psychbc" on August 24, 2017.  (Tr. 359-63.)  Her complaints included: "crying, heart racing, shortness of breath, feeling overwhelmed, restless sleep, and nightmares."  (Tr. 359.)  She also reported feeling overwhelmed, stressed, and worried about her own health, taking care of her parents and her two children, and working full time with fibromyalgia.  (Tr. 359-60.)   A mental status examination showed: appropriate eye contact; cooperative attitude and behavior; orientation to place, person, situation, and time; adequate speech and tone; affect appropriate to content and mood congruent with affect; low self-esteem; good memory; average intelligence; and good insight and judgment.  (Tr. 361-62.) Individual therapy was planned.  (Tr. 362.)  Ms. Mott continued to see LISW Mizen for individual therapy through May 2018, with mental status examination findings that remained generally unchanged during that period.  (Tr. 364-406.)

In September 2017, Ms. Mott reported decreased symptoms to LISW Mizen after being in therapy and on medication for six weeks.  (Tr. 374.)  She also reported feeling "much better and centered," after having felt "in despair and overwhelmed" when she started therapy.  (Tr. 378.)  In November 2017, she reported increased anxiety and depression, noting she had called in sick at work because of her mental health.  (Tr. 384.)  She also reported having fallen at work and injuring her knee.  (*Id*.)   In December 2017, Ms. Mott reported fibromyalgia flare ups and needing to take some time off work, but indicated her job was less hectic.  (Tr. 390.)  She reported that her anxiety had decreased and she felt her symptoms were decreasing.  (*Id*.)  In January 2018, she reported that she had tried to decrease her Lexapro because she was feeling

8

better, but her anxiety and depression started to increase within three days and she resumed the full dose.  (Tr. 393.)  She reported trying to work with her doctors on her medications.  (*Id*.)

On March 8, 2018, Ms. Mott reported to LISW Mizen that she lost her job of nineteen years due to "excessive absences even though she had the sick time and vacation."  (Tr. 396.)  At a neurology follow up on that same date, her mental status examination findings were normal and Dr. Parikh renewed her prescriptions for Lexapro and Klonopin for anxiety and RLS.  (Tr. 576.)  At a primary care appointment on May 15, 2018, Ms. Mott stated she was doing okay with her generalized anxiety disorder ("GAD") and was still taking Lexapro.  (Tr. 432.)  Her mental status findings were normal, with the exception of a depressed mood.  (*Id*.)  Dr. Moya observed that her GAD symptoms were in remission with Lexapro, and recommended that she continue her current care.  (Tr. 435.)

On March 22, 2018, Ms. Mott reported to LISW Mizen that she was continuing to struggle with her fibromyalgia, mental health symptoms, and financial stressors due to losing her job.  (Tr. 399.)  In April 2018, she reported feeling ashamed because she lost her job, but also said she did not feel she could work because her knee injury, fatigue, and frequent migraines.  (Tr. 402.)  In May 2018, she reported being depressed and lacking motivation, and was observed to be tearful.  (Tr. 405.)

At a primary care visit in August 2018, Ms. Mott reported that her anxiety was worse, despite taking Lexapro daily and Klonopin nightly.  (Tr. 419.)  She noted that she had not seen her counselor "in a while," and needed to go back.  (*Id*.)  On examination, she was oriented and pleasant, with good eye contact, but appeared depressed and tired.  (Tr. 420-21.)  Her anxiety was noted to be "[n]ot controlled on Lexapro," and additional medications were considered.  (Tr. 421-22.)  Cymbalta was ruled out due to prior side effects.  (Tr. 422.)  At a neurology

9

appointment that same month, Dr. Parikh continued her Lexapro and Klonopin for anxiety and RLS.  (Tr. 573.)  Her mental status examination findings were normal.  (Tr. 572.)

During a primary care visit in September 2018, Ms. Mott reported that she was back in counseling for anxiety and was feeling better.  (Tr.  413.)  On examination, she was alert and oriented with normal memory, affect, and judgment, and good eye contact, but appeared tired.  (Tr. 413-14.)  She was continued on Lexapro for GAD.  (Tr. 415.)

During a neurological follow up with Dr. Parikh in November 2018, Ms. Mott was continued on Lexapro and Klonopin for anxiety and RLS.  (Tr. 569.)  Her mental status examination showed her to be in no distress, alert, interactive, and cooperative with appropriate affect, intact memory, normal attention span and concentration, normal comprehension, and adequate knowledge.  (Tr. 568.)

Ms. Mott returned to see LISW Mizen for counseling on December 8, 2018, reporting that she had increased symptoms of depression and anxiety.  (Tr. 969.)  She was tearful and emotional, and reported that she still was not working due to her injury and fibromyalgia, and that her husband had been diagnosed with cancer.  (*Id*.)  On examination, she was disheveled, fatigued, sad, depressed, anxious, nervous/stressed, worried, and had gained weight.  (Tr. 964, 966, 967.)  Her speech was noted to be slow/halting, her thought process was slowed, and she lost track during the conversation.  (Tr. 965-66.)  Nevertheless, her associations were within normal limits and intact, there was no evidence of psychotic thoughts, her judgment and insight were good, her memory and knowledge were intact, her language and behavior were within normal limits, and she was oriented to person, place, and time.  (Tr. 965-67.)   LISW Mizen recommended counseling at least once a month, noting that Ms. Mott indicated she could not attend more often because she was caring for her husband and son.  (Tr. 969.)

10

When Ms. Mott saw LISW Mizen in February 2019, she reported feeling like her life was falling apart, having increased symptoms of anxiety and depression, and wanting to feel better. (Tr. 978.)  Examination findings were similar to those noted during her December 2018 counseling session.  (*Compare* Tr. 985-88 *with* Tr. 964-67.)  She reported concern regarding her husband's cancer treatment, increased pain and fatigue, nightmares and restless sleep, and feeling like a failure.  (Tr. 990.)  Similar reports and examination findings were noted at an April 20, 2019 counseling session with LISW Mizen.  (*Compare* Tr. 999-1019 *with* Tr. 978-98.)

At a neurology visit in May 2019, Dr. Parikh continued Ms. Mott on Klonopin for RLS. (Tr. 1070-74.)  At a follow up visit in November 2019, he continued her on Klonopin for RLS and noted she had started Effexor for anxiety.  (Tr. 1078.)  At both neurology visits, Ms. Mott's mental status examination findings were within normal limits.  (Tr. 1073, 1077.)

### 2.  Opinion Evidence

#### i.  Physical Impairment Opinion Evidence

##### a.  Treating Chiropractor Questionnaire

Chiropractor Brian Studer, D.C. completed a questionnaire on March 14, 2019, stating that he first saw Ms. Mott on March 13, 2018 and last saw her on March 14, 2019.  (Tr. 851-853.)  Dr. Studer listed the following diagnoses: L3-S1 disc displacement and C5/6 cervical disc.  (Tr. 852.)  He noted the following findings on examination: positive orthopedic tests, positive cervical disc MRI, and muscle spasm.  (*Id*.)  There is an unclear notation about decreased ranges.  (*Id*.)  Dr. Studer noted that he provided the following therapy and interventions: manipulation, massage, traction, electrical stimulation, ultrasound, prescription medication, exercises, and she was referred to a medical doctor for treatment.  (Tr. 852-53.)  He indicated that the various interventions helped Ms. Mott, but noted she had suffered a new auto

11

injury that month.  (Tr. 853.)  He opined that she could not work due to ongoing pain, spasms, and injuries from multiple car accidents and work injury.  (*Id*.)

### b.        State Agency Medical Consultants

On March 22, 2019, state agency medical consultant Mehr Siddiqui, M.D. completed a physical RFC assessment, opining that Ms. Mott had the RFC to perform light work with the following postural limitations: occasional climbing of ladders, ropes, and scaffolds; frequent climbing of ramps and stairs; and frequent crouching, kneeling, and crawling.  (Tr. 76–77.)  Dr. Siddiqui explained that the RFC limitations were supported by evidence of fibromyalgia pain, as well as symptoms and negative brain, cervical spine, and right shoulder imaging.  (*Id*.)  On reconsideration on July 16, 2019, state agency medical consultant Bradley Lewis, M.D. adopted the Dr. Siddiqui's RFC findings.  (Tr. 94-95.)

### ii.        Mental Health Impairment Opinion Evidence

### a.        Consultative Examination

On February 23, 2019, Ms. Mott presented for a consultative psychological examination performed by Jeff Rindsberg, Psy.D., ABPP of The Forensic Group.  (Tr. 845-50.)  She reported she was diagnosed with fibromyalgia in 2007 and had been working with her condition "but she just could not work anymore."  (Tr. 845.)  She reported that she was in counseling, her primary care physician had prescribed Effexor, and her neurologist had prescribed Clonazepam.  (Tr. 846.)  On examination, Ms. Mott was described as: low energy, soft-spoken, reserved demeanor, and mildly dysphoric.  (Tr. 848.)  Otherwise examination findings were generally normal, showing: she was calm and cooperative and had good eye contact; her grooming was fair; there were no signs of agitation or problems with impulse control or excess energy; she communicated without difficulty; her speech was appropriate; there were no indications of psychosis; she

performed serial sevens from 100 to the fifth place without error; her immediate recall for three words was perfect; she recalled one out of three words after short and long-term delay with recognition of one out of the other two words when provided a cue; she could interpret two proverbs without difficulty; and risk of harm to herself or others was deemed low.  (Tr. 847-48.)

Dr. Rindsberg indicated that panic disorder was noted based on her reported history and unspecified depressive disorder was noted based on the medications she reported taking.  (Tr. 849.)  With respect to his functional assessment, Dr. Rindsberg opined:

- "Ms. Mott can understand, carry out, and remember instructions.  While she referred to 'brain fog,' this was not evident during the interview or mental status exam."

- "Maintaining attention and concentration should not be a major issue for Ms. Mott.  She has the ability to focus and do what is asked.  She can persist and persevere."

- "Interacting with others is also not . . . a problem.  Ms. Mott is able to socialize."

- "Handling pressure in a work situation should not be a major issue for Ms. Mott. She is on medication and seems to be fairly stable as far as mental health symptoms."

(Tr. 849.)

**b.    State Agency Psychological Consultants**

On March 6, 2019, state agency psychological consultant Juliette Savitscus, Ph.D. completed a mental RFC assessment, opining that Ms. Mott had no limitations with understanding or memory or with sustained concentration and persistence.  (Tr. 77-78.)  Dr. Savitscus opined that there were moderate social interaction limitations, explaining that Ms. Mott would require little to no interaction with the general public.  (Tr. 78.)   She also opined that there were moderate adaptation limitations, explaining that Ms. Mott would require relatively static / routine tasks where changes could be explained.  (*Id*.)

13

On reconsideration, on July 16, 2019, state agency psychological consultant Jennifer Swain, Psy.D. noted that Ms. Mott reported receiving benefit from Effexor and found that the record supported the initial RFC findings of Dr. Savitscus. (Tr. 96-97.)

## C.  Hearing Testimony

### 1.  Plaintiff's Testimony

At her April 23, 2020 hearing, Ms. Mott testified in response to questioning by the ALJ and her representative.  (Tr. 47-59.)   She testified that she was unable to work full-time because her fibromyalgia and associated symptoms which included: anxiety, exhaustion, and daily pain. (Tr. 48-49.)  She indicated that she experienced pain throughout her entire body – in her feet, legs, shoulders, hands, elbows, hips, and back.  (Tr. 49.)  She reported having bulging discs in her neck and back that contributed to her pain.  (Tr. 58.)  She estimated that her pain on a daily basis was on average a five or six on a scale of one to ten, with ten being the worst.  (Tr. 49-50.) She commented that her pain levels changed daily, depending on the extent of her activities.  (Tr. 50.)  She indicated that she always had inflammation associated with her pain.  (Tr. 53-54.)  She testified to taking Tylenol for pain and using ice packs, IcyHot, and a prescribed anti-inflammatory topical cream.  (Tr. 50.)  She also stated that she used a "little machine that kind of like zaps the area," but she could not recall the name of the machine.  (*Id*.)

Ms. Mott testified that migraines "could be like once a week" and usually lasted for a couple of days.  (Tr. 55-56.)  She reported taking medication for RLS, which helped but not completely.  (Tr. 56.)  She explained that her legs "still shake.  But not what it was before . . . Now it's just toned down.  Every day it still goes, but not to that extent."  (*Id*.)   She reported waking up exhausted, even after sleeping for twelve or fourteen hours.  (*Id*.)

She stated that she took medication that helped with her symptoms of depression, but still experienced anxiety. (Tr. 56-57.) She explained that she had anxiety when doing unfamiliar or new things. (Tr. 57-58.)

Ms. Mott estimated she was able to stand for about an hour at a time on a good day, but only about five or ten minutes on a bad day. (Tr. 50-51.) She testified that the length of time she would be able to walk without resting varied, explaining that one day she might be able to walk a block and a half while another day she might be able to walk a mile. (Tr. 51.) She reported that she could sit for about an hour at a time, provided she was sitting comfortably somewhere. (Tr. 51-52.) However, if she was not seated comfortably, she estimated being able to sit for only about fifteen or twenty minutes before needing get up and move and sit back down. (*Id.*) She indicated that it was difficult for her to go up and down stairs prior to her knee surgeries, but that it was not as difficult post-surgery. (Tr. 51.) She still reported some pain doing so. (*Id.*) She also testified to being unable to get down on her knees or squat. (Tr. 58.) She said it was hard to lift even a gallon of milk because it caused pain down into her elbows and wrist. (Tr. 51.) She also reported that she had to lie down often because of extreme back pain, and that there were days when she could not get out of bed. (Tr. 52-53.)

When asked to describe a typical day, Ms. Mott explained what she did the day before, stating:

> Usually I get up. It takes me about a good hour and a half to two hours to actually get going. I'm very slow in the morning, just kind of -- I have to just take it easy. And I was messing with the sewing machine yesterday. And then I ended up cooking dinner, chicken wings, put them in the oven and cook. That's a more relaxing day yesterday. And I did a little laundry.

(Tr. 54.) She reported that she generally showered and changed her clothes daily, although she indicated there were times when she has missed bathing two or three times a month because she

15

could not function. (Tr. 54-55.) She testified that she missed about eighty-four days of work in the calendar year 2017. (Tr. 55.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. (Tr. 59-64.) She classified Ms. Mott's past work as that of a customer service manager and retail store manager, both under the same DOT code, classified as a medium exertional job with an SVP of 7. (Tr. 60.)

For his first hypothetical, the ALJ asked the VE to assume an individual the same age and with the same educational and vocational background as Ms. Mott who:

> could perform work at the light exertional level. There are additional limitations, however, such as she could frequently climb ramps and stairs, and could occasionally climb ladders, ropes, or scaffolds. In this hypothetical, there is a limitation to frequent crawling, crouching, or kneeling. This person would require a job with little contact with the general public, and with relatively static, routine tasks, and work changes to be explained.

(Tr. 60-61.) The VE testified that the described individual could not perform Ms. Mott's past work but could perform the following light exertional jobs: housekeeping cleaner, merchandise marker, and hand packager inspector. (Tr. 61.) The VE testified that employers in the industrial sector would not tolerate absences during a probationary period and they would generally tolerate eight absences over the course of year. (Tr. 62.) She noted that employers in healthcare and government sectors are a little more tolerant of absences during a probationary period. (*Id.*) The VE testified that the jobs identified in response to the ALJ's hypothetical would not be available if the individual would be off-task twenty percent of the workday. (Tr. 62-63.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. Disability is defined as the "inability to engage in any

16

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his May 27, 2020 decision, the ALJ made the following findings:[1]

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023. (Tr. 12.)

2. The claimant has not engaged in substantial gainful activity since March 6, 2018, the alleged onset date. (*Id.*)

3. The claimant has the following severe impairments: right patellafemoral syndrome with full thickness chondral tear status-post arthroscopy, fibromyalgia, migraine or tension headaches, depression, and anxiety. (Tr. 12-13.) The claimant also has the following non-severe impairments: restless leg syndrome, gastroesophageal reflux disease with irritable bowel syndrome, recurrent ventral hernia and chronic retro-muscular seroma (which responded amelioratively to Nexium), colon polyp, anthralgia of the left temporomandibular joint, vertigo but no ongoing issues, carpal tunnel-like symptoms in her hands ("pain and stiffness"), and obesity. (*Id.*)

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments. (Tr. 13-18.)

5. The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except for the following limitations: she can frequently climb ramps and stairs, but occasionally climb ladders, ropes, and scaffolds; she can frequently kneel, crouch, or crawl; she can have little to no interaction with the general public; and she requires relatively static routine tasks where changes can be explained. (Tr. 19-21.)

---

[1] The ALJ's findings are summarized.

6.      The claimant is unable to perform any past relevant work. (Tr. 21-22.)

7.      The claimant was born in 1970 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  (Tr. 22.)

8.      The claimant has at least a high school education and is able to communicate in English.  (*Id.*)

9.      Transferability of job skills is not material to the determination of disability.  (*Id.*)

10.     Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant number in the national economy that he can perform such as housekeeping cleaner, merchandise marker, and hand packager.  (Tr. 22-24.)

Based on the foregoing, the ALJ determined that Ms. Mott had not been under a disability from March 6, 2018, through the date of the decision.  (Tr. 24.)

## V.      Plaintiff's Arguments

Ms. Mott challenges the constitutional authority of the Commissioner to decide her case, and raises substantive objections to his decision as follows:

1.  The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul was constitutionally defective.  (ECF Doc. 15 pp. 1, 8-10; ECF Doc. 18 pp. 2-7.)

2.  The ALJ committed harmful error when he failed to find that Mott was disabled at Step Three of the Sequential Evaluation. In the alternative, the ALJ erred in forming the RFC when he failed to properly evaluate the evidence documenting the combination of Mott's severe impairments.  (ECF Doc. 15 pp. 1, 10-19; ECF Doc. 18 pp. 1-2.)

3.  The ALJ committed harmful error when he failed to include Mott's symptoms in the RFC in violation of Social Security Ruling 16-3p.  (ECF Doc. 15 pp. 19-23; ECF Doc. 18 pp. 1-2.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406, *quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision

20

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004))); *see also Rabbers*, 582 F.3d 647, 654 ("Generally, … we review decisions of administrative agencies for harmless error.").   In addition, a decision will not be upheld if the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First Assignment of Error: Whether Ms. Mott Has Standing to Challenge ALJ
          Decision Based on Alleged Separation of Powers Violation by the Commissioner**

Ms. Mott argues that the ALJ decision here is "constitutionally defective" because the appointment of the former Commissioner of Social Security violated separation of powers principles.  (ECF Doc. 15 pp. 1, 8-10; ECF Doc. 18 pp. 2-7.)  Specifically, she argues based on *Seila Law LLC v. Consumer Fin. Prot. Bureau*, —— U.S. ——, 140 S. Ct. 2183, 207 L.Ed.2d 494 (2020) that the statute under which the former Commissioner was appointed violated separation

21

of powers principles by allowing him to serve a longer term than the President of the United

States while protecting him from removal except for cause, similar to the statute found

unconstitutional in *Seila Law*.  (ECF Doc. 15 pp. 8-9 (challenging 42 U.S.C. § 902(a)(3)).)  Ms.

Mott argues based on this precedent that the ALJ's authority to issue the decision in this case

was "constitutionally defective" because his authority was delegated from the Commissioner,

and because the ALJ's decision was improperly based on regulations promulgated by the former

Commissioner without authority.  (ECF Doc. 15 pp. 1, 8-10; ECF Doc. 18 pp. 2-7.)

 The Commissioner does not dispute that the relevant removal provision "violates the

separation of powers to the extent it is construed as limiting the President's authority to remove

the Commissioner without cause" (ECF Doc. 17 p. 6 (citing Office of Legal Counsel, U.S. Dep't

of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021

WL 2981542 (July 8, 2021)), but argues that Ms. Mott is not entitled to relief because "even

where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that

basis must show that the restriction actually caused her harm." (*Id.* (citing *Collins v. Yellen*, ⸻

U.S. ⸺, 141 S. Ct. 1761, 1787-89, 210 L.Ed.2d 432 (2021)).)  More specifically, the

Commissioner argues that Ms. Mott cannot show harm to support her claim for relief because the

ALJ's appointment was ratified by an Acting Commissioner who was not subject to the

challenged removal restriction, and because Ms. Mott cannot show that the removal restriction

caused the denial of her benefits.  (ECF Doc. 17 p. 6.)

 Having considered the arguments of the parties and the applicable law, the undersigned

agrees with numerous other courts that Ms. Mott's constitutional challenge to a statutory removal

provision for the Commissioner of Social Security suffers from a fundamental deficiency in this

individual Social Security disability appeal, namely that Ms. Mott lacks standing to assert the

challenge.[2]  *See Miley v. Comm'r of Soc. Sec.*, No. 1:20-cv-2550, 2021 WL 6064754, *9 (N.D. Ohio Dec. 22, 2021); *Rhouma v. Comm'r of Soc. Sec.*, --- F.Supp.3d ---, 2021 WL 5882671, at *10 (N.D. Ohio Dec. 13, 2021); *Catherine J.S.W. v. Comm'r of Soc. Sec.*, No. 3:20-cv-5602-TLF, 2021 WL 5276522, *8 (W.D. Wash. Nov. 12, 2021); *Melvin S. v. Comm'r of Soc. Sec.*, No. 20-5978, 2021 WL 6072564, at *11 (W.D. Wash. Dec. 22, 2021); *Helms v. Comm'r of Soc. Sec.*, No. 3:20-CV-589-MOC, 2021 WL 5710096, at *3 (W.D.N.C. Dec. 1, 2021); *Cooper v. Saul*, No. 21-CV-38-CJW-MAR, 2021 WL 2908112, at *2 (N.D. Iowa July 9, 2021).

Standing is a threshold issue, and a failure to establish standing means a court cannot address the merits of a claim.  *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the case.")  Although the Commissioner did not directly challenge Ms. Mott's standing in this case, this Court has the ability and the obligation to raise the issue of standing *sua sponte* where it is in doubt.  *See Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007) ("Because the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*.").  Indeed, "[a]s a jurisdictional requirement, standing ... cannot be waived or forfeited." *Virginia House of Delegates v. Bethune-Hill*, ⸺ U.S. ⸺, 139 S. Ct. 1945, 1951, 204 L.Ed.2d 305 (2019).  Moreover, it is noted that the primary defect challenged by the Commissioner in her briefing – that Ms. Mott did not suffer actual harm caused by the statutory removal provision – is also a key element of the standing analysis discussed herein.

---

[2] The Commissioner also argues that Ms. Mott's request for relief under *Seila Law* fails under other legal and equitable doctrines, including harmless error, de facto officer, the rule of necessity, and broad prudential considerations.  (ECF Doc. 17 pp. 7-18.)  Because the undersigned concludes that this Court does not have standing to hear the relevant constitutional arguments, these additional arguments will not be addressed herein.

(ECF Doc. 17 p. 7.) *See also Rhouma*, 2021 WL 5882671, at *10 (raising standing *sua sponte* when "the Commissioner doesn't use the word 'standing,' [but] argues that [the plaintiff] has not established a 'nexus' between § 902(a)(3)'s removal restrictions and an alleged harm," and "has effectively argued that [the plaintiff] has not met the traceability requirement for standing").

As explained in *Collins*, Ms. Mott must satisfy a three-pronged test to establish Article III standing, namely: "[she] must show that [she] has suffered an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'" 141 S. Ct. at 1779 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *see also Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 523–24 (6th Cir. 2001); *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021).

Under the second "traceability" prong, the Supreme Court held in *Collins* that a plaintiff challenging a statutory removal provision for an executive officer could demonstrate standing "by showing that [she] was harmed by an action that was taken by such an officer and that the plaintiff alleges was void."  141 S. Ct. at 1788, n. 24; *see also Collins*, 141 S. Ct. at 1779 (finding standing to challenge statutory removal protection for FHFA Director when alleged financial injury was traceable to the FHFA's adoption and implementation of a policy that deprived defendants of shareholder profits) (quoting *Seila Law*, 140 S.Ct. at 2196 (("In the specific context of the President's removal power, we have found it sufficient that the challenger sustains injury from an executive act that allegedly exceeds the official's authority" (brackets and internal quotation marks omitted))).   However, the Court explicitly clarified that this "holding on standing does not mean that actions taken by such an officer are void *ab initio* and must be undone."  141 S. Ct. at 1788, n. 24.

As the party invoking federal jurisdiction in this case, Ms. Mott bears the burden of establishing standing for each claim and form of relief.  *See Loren*, 505 F.3d at 607 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 1867, 164 L.Ed.2d 589 (2006).  Ms. Mott argues that the requirements for standing are met because the Commissioner did not argue otherwise, and for the reasons set forth in two district court cases addressing similar constitutional challenges.  (ECF Doc. 18 p. 3 (citing *Brinkman v. Kijakazi*, No.  2:21-CV-00528-EJY, 2021 WL 4462897, at *2 (D. Nev. Sept. 9, 2021) and *Sylvia v. Kijakazi*, No. 5:21-CV-076-M-BQ, 2021 WL 4692293, at *3 (N.D. Tex. Sept. 13, 2021), *report and recommendation adopted*, No. 5:21-CV-076-M-BQ, 2021 WL 4622528 (N.D. Tex. Oct. 7, 2021).)  Given that standing cannot be waived or forfeited, the pertinent question is whether Ms. Mott has successfully demonstrated that the "traceability" requirement is met in this case.

The court in *Brinkman* did face a similar challenge to an ALJ decision based on the alleged unconstitutionality of the statutory removal provision for the Commissioner of Social Security under *Seila Law*.  2021 WL 4462897, at *1.  And contrary to the argument offered by Ms. Mott in this case, the *Brinkman* court held: "Plaintiff cannot establish traceability. Because Plaintiff cannot demonstrate traceability, she lacks standing to bring her constitutional challenge."  *Id.* at *2 (emphasis added).  Citing to *Collins* and *Seila Law*, the court explained: "Because Plaintiff offers nothing that traces the decision by the ALJ in her case to any alleged injurious conduct by the SSA Commissioner, she has not demonstrated traceability and her constitutional violation claim fails for lack of standing."  *Id.* (citing *Seila Law*, 140 S.Ct. at 2196 and *Collins*, 141 S.Ct. at 1779).  This case clearly does not support a finding that Ms. Mott has demonstrated standing to pursue her constitutional claim in this case.

25

In contrast, the court in *Sylvia* found that the "traceability" requirement was met for a similar challenge "[b]ecause the ALJ derives authority directly from the Commissioner, and the ALJ's disability determination becomes the Commissioner's final decision." 2021 WL 4692293, at *3.  In so finding, the court relied in part on another court's observation that "[i]f the removal protections afforded the Commissioner violate the constitutional requirement of separation of powers, the Commissioner has no authority to delegate."  *Id.* (quoting *Tafoya v. Kijakazi*, No. 21-CV-00871-REB, 551 F.Supp.3d 1054, 2021 WL 3269640, at *5 (D. Colo. July 29, 2021)).  Indeed, the *Tafoya* court went on to state: "Under those conditions, the ALJs themselves ostensibly are operating without constitutional authority, and their disability determinations – which again, are the decisions of the Commissioner – arguably are null."  *Tafoya*, 551 F.Supp.3d at 1061.

Consistent with the findings in *Sylvia* and *Tafoya*, Ms. Mott asserts that the ALJ decision here was "constitutionally defective" because the ALJ's authority was delegated by the Commissioner.  (ECF Doc. 15 p. 9; ECF Doc. 18 p. 3.)  In other words, she contends that the ALJ lacked authority to issue the present decision because the Commissioner lacked the ability to delegate that authority to him.  However, such a finding is in direct conflict with the Supreme Court's conclusion in *Collins* that the unlawfulness of a similar removal provision did not strip the relevant executive officer "of the power to undertake the other responsibilities of his office." 141 S. Ct. at 1788 n. 23 (citing *Seila Law*, 140 S.Ct. at 2207-2211).  The *Collins* Court explained because the relevant statute "unconstitutionally limited the President's authority to *remove*" the officer, but "there was no constitutional defect in the statutorily prescribed method of appointment to that office," there was accordingly "no reason to regard any of the actions taken by the [agency] … as void."  *Id.* at 1787 (emphasis in original).  In so finding, the Court

26

distinguished prior separation of powers decisions involving "a Government actor's exercise of power that the actor did not lawfully possess," including the holding in *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018) that certain administrative law judges were appointed in violation of Appointments Clause.  *Id.* at 1788 (citations omitted).  Thus, the Court distinguished the impact of an unlawful appointment clause – as in *Lucia* – from an unlawful removal clause – as in *Seila Law*, *Collins*, and the present case.

Based on the Supreme Court's explicit findings in *Collins*, there is no legal basis for the undersigned to conclude that actions of the SSA Commissioner or the ALJ in this case were automatically void or lacking in authority.  Thus, the determination must return to the question whether Ms. Mott was "harmed by an action that was taken by [the SSA Commissioner] and that [she] alleges was void."  *Collins*, 141 S. Ct. at 1788, n. 24.  In addition to arguing that the ALJ lacked delegated authority to issue his decision, Ms. Mott asserts that the ALJ decided this case "based on regulations promulgated by Mr. Saul when he had no authority to issue the same," and more specifically that the former Commissioner "implemented changes in HALLEX which modified the way in which decisions were written (I-2-3-20 in effect July 17, 2019)" and "modified the way in which musculoskeletal impairments are evaluated (DI 34121.013 and DI 34121.015."  (ECF Doc. 15 p. 9; ECF Doc. 18 p. 4.)

First, Ms. Mott's arguments on this point are underdeveloped, as she has given no argument or explanation as to how the identified actions by the Commissioner are traceable to any harm suffered in the present case.  To demonstrate standing, Ms. Mott must show that the policy and/or regulatory changes implemented by the former Commissioner adversely affected her.  *See Lujan*, 504 U.S. at 559 n.1 ("[T]he injury must affect the plaintiff in a personal and individual way.").  Second, even a cursory review of the actions of the former Commissioner

27

identified by Ms. Mott reflects that those actions are not traceable to harm asserted by Ms. Mott

in this case.  As to the identified changes to HALLEX, an internal procedural manual for the

Social Security Administration, the cited change pertains to the way that Office of Hearings

Operations staff will respond when a notice of hearing acknowledgement is not returned.  *See*

HALLEX I-2-3-20.[3]  No challenge is raised in this case regarding deficiencies with the notices

of hearing.  As to the identified changes to the musculoskeletal listings, it is evident that the

identified changes took effect on April 1, 2021, almost one year after the ALJ's decision in this

case (Tr. 7-28), and thus could not have impacted this decision. *See* DI 34121.013.[4]  Unlike the

shareholders in *Collins*, whose injury – the loss of net worth in companies in which they owned

shares – was directly traceable to the Federal Housing Finance Agency Director's amendment of

the formula to calculate dividends, here Ms. Mott has not demonstrated that the regulatory

changes she identifies impacted the denial of benefits.  *Collins*, 141 S. Ct. at 1779.

Consistent with the findings of other courts, the undersigned therefore concludes that Ms.

Mott has failed to establish that she has suffered harm traceable to an unlawful action by the

former Commissioner of Social Security, and has accordingly failed to establish standing to

pursue this constitutional challenge.  *See, e.g., Rhouma*,  2021 WL 5882671 at * 11 ("Without a

harm traceable to an unlawful action by the Commissioner, [plaintiff] does not have standing to

---

[3] The February 23, 2021 revision of HALLEX I-2-3-20 "updated and clarified the action that Office of Hearings Operations (OHO) staff will take if a claimant or appointed representative does not return an acknowledgment of the notice of hearing."  Transmittal I-2-240, Soc. Sec. Admi. Office of Analytics Review and Oversight, available at https://www.ssa.gov/OP_Home/hallex/TS/tsi-2-240.html#:~:text=This%20transmittal%20amends%20section%20I-2-3-20%20of%20the%20Hearings%2C,404.938%20and%20416.1438.%20Explanation%20of%20Content%20and%20Changes (last visited 4/1/2022).

[4] https://secure.ssa.gov/poms nsf/lnx/0434121013 (last visited 4/1/2022).

challenge the constitutionality of § 902(a)(3)."); *Catherine J.S.W.*, 2021 WL 5276522 at *8 ("Because Plaintiff has not shown any compensable harm fairly traceable to the actions of former Commissioner Saul, under *Collins v. Yellin,* 594 S. Ct. 1761,1788 (2021), the Plaintiff's situation is distinguishable from the plaintiff's claims in *Collins*; Plaintiff has failed to establish standing and the Court need not address the Plaintiff's or Defendant's additional arguments."); *Helms*, 2021 WL 5710096 at *3 ("The Court finds that it is implausible that the Commissioner's protection from removal from office, whether constitutional or not, could have affected ALJ Goodson's decision or any other aspect of the administrative litigation in a material way. Because Plaintiff has not shown that she was in any way injured by the removal protection provision, she does not have standing to litigate its constitutionality.").

Because the undersigned concludes that Ms. Mott does not have standing to proceed with her separation of powers constitutional claim, the undersigned recommends that the Court deny Ms. Mott's request for a remand based on the asserted constitutional challenge.

## C.    Second Assignment of Error: Whether ALJ's Step Three Determinations and RFC are Supported by Substantial Evidence

As it pertains to Ms. Mott's second assignment of error, the undersigned has determined that the following issues were sufficiently identified and argued: (1) whether the ALJ sufficiently considered the combined effect of her knee problems and obesity at Step Three and when finding Ms. Mott could perform light exertional work (ECF Doc. 15 pp. 12-14; ECF Doc. 18, p. 2); (2) whether the ALJ erred in finding that she had no more than mild to moderate limitations in the four categories of mental functioning at Step Three (ECF Doc. 15 pp. 14-15); (3) whether the ALJ failed to properly consider the effects of her fibromyalgia as required by SSR 12-2p (ECF Doc. 15 pp. 15-16); and (4) whether the ALJ failed to properly analyze her headaches when

finding that her headaches did not medically equal Listing 11.02 (ECF Doc. 15 pp. 17; ECF Doc. 18 pp. 1-2).  Each of these arguments will be addressed in turn below.

To the extent that Ms. Mott intended to assert other issues in this appeal, the undersigned finds that they were raised in a perfunctory manner, without developed or clearly articulated argument, and are therefore deemed waived.  *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones."); *Hough*, 2014 WL 764634, at *9 (relying on *McPherson* when noting plaintiff did not sufficiently present her claimed errors); *Ray v. Saul*, No. 1:19-CV-01880, 2020 WL 5203493, at *10 (N.D. Ohio Sept. 1, 2020) (finding conclusory and undeveloped arguments waived).

### 1.    Whether ALJ Failed to Consider Combined Effects of Knee Impairment and Obesity at Steps Three and Four

Ms. Mott argues that the ALJ "erroneously found that the combination of her knee problems and obesity allowed her [to] stand/walk six hours per day" and that "[t]he combination of the medical records and [her] statements precluded her from standing/walking the six hours required for work at the light level of exertion."  (ECF Doc. 15 p. 13.)  Ms. Mott references Listing 1.02 in presenting her argument, but largely focuses on the ALJ's RFC finding.

On May 20, 2019, the Social Security Administration published SSR 19-2p, which rescinded and replaced the guidelines for evaluating obesity under SSR 02-1p.  Social Security Ruling 19-2p "provides guidance on how [SSA] establish[es] that a person has a medically determinable impairment (MDI) of obesity," and how SSA "evaluate[s] obesity in disability claims."  SSR 19-2p, 84 Fed. Reg. 22924, 22924 (May 20, 2019).  In particular, SSR 19-2p

provides that "[t]he combined effects of obesity with other impairment(s) may be greater than the effects of each of the impairments considered separately," and that the RFC should account for "the effect obesity has upon the person's ability to perform routine movement and necessary physical activity within the work environment." *Id*. at 22925-26; *see also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016) (noting that SSR 02-1p, the predecessor to SSR 19-2p, "directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation") (citations omitted).  Additionally, as explained in paragraph Q of the introductory section of Listing 1.00:

> Obesity is a medically determinable impairment that is often associated with musculoskeletal disorders. Obesity increases stress on weight-bearing joints and may contribute to limitation of the range of motion of the skeletal spine and extremities. The combined effects of obesity with a musculoskeletal disorder can be greater than the effects of each of the impairments considered separately. We consider the additional and cumulative effects of your obesity when we determine whether you have a severe musculoskeletal disorder, a listing-level musculoskeletal disorder, a combination of impairments that medically equals the severity of a listed impairment, and when we assess your residual functional capacity.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

### i.    Step Three Analysis

The ALJ clearly discussed the combined effects of Ms. Mott's obesity and knee impairments in his Step Three analysis, reaching the conclusion that these effects did not satisfy Listing 1.02.  (Tr. 13-14.)  In support of this finding, he discussed radiological imagery and treatments for her bilateral knees from her work injury in 2017 through her surgery in 2019.  (Tr. 14.)  He acknowledged her chronic knee pain, but noted that "her neurologist and primary care physician observed that [her] gait was generally normal and she denied having fallen in the last six months preceding her right knee procedure."  (*Id.* (citing Tr. 413, 1068, 1070, 1075).)  The ALJ also discussed the impact of her obesity, explaining that he "considered the possible

31

aggravating factor of her obesity on her right knee pain" but noted that her obesity "has not imposed any specific balance issues."  (Tr. 14 (citing Tr. 1073 (5/20/19 neurology visit; stable stance with negative Romberg)).)  Based on his review of the record, he concluded that "the longitudinal effects of the claimant's right knee impairment with secondary effects on her left knee and the aggravating effects of her obesity have imposed significant limitations, but not at the requisite" listing level severity.  (Tr. 14.)

Although her argument largely focuses on the Step Four RFC analysis, Ms. Mott does challenge the ALJ's observation at Step Three that her gait was "generally normal" (Tr. 14), arguing that "[t]his statement failed to consider the times when [Ms.] Mott was observed with an ataxic gait."  (ECF Doc. 15 p. 13 (citing Tr. 568 (11/19/18 neurology visit; ataxic gait due to right knee brace)).)  On the contrary, when the ALJ described Ms. Mott's gait as "generally normal," he cited not only to three treatment visits where Ms. Mott's gait was observed to be normal but also to one visit where her gait was observed to be ataxic due to a right knee brace. (Tr. 14 (citing Tr. 413 (9/14/18 pcp visit; normal gait), 1068 (11/19/18 neurology visit; ataxic gait due to right knee brace); 1070 (5/20/19 neurology visit; normal gait); 1075 (11/20/19 neurology visit; normal gait)).)  In fact, the ALJ cited to the same November 19, 2018 neurology examination findings that Ms. Mott contends he failed to consider.  (*Compare* Tr. 566-69 *with* 1066-69.)  Upon review of the ALJ's findings and the record as a whole, the undersigned finds that observation that Ms. Mott had a "generally normal" gait did not ignore or mischaracterize the evidence of record which indicated that her gait was sometimes abnormal when she wore a knee brace.  Ms. Mott has not met her burden to demonstrate reversible error on this basis.

ii.      **Step Four Analysis**

A review of the ALJ's decision also reflects that he properly considered Ms. Mott's

combination of impairments – including her severe knee impairments and non-severe obesity –

at Step Four, where he concluded that she had the RFC to perform light work.  He explained:

> Physically, the undersigned finds that the surgical effects of the claimant's right
> knee and the chronic effects of the claimant's fibromyalgia have caused her
> significant limitation to the extent that she is restricted to a reduced range of light
> work with additional nonexertional postural limitations to the extent described in
> this finding on a regular and continuing basis
>
> The undersigned notes that the claimant has required surgical treatment for her right
> knee impairment that she sustained in November 2017, after conservative treatment
> failed. The record fails to establish any ambulatory issues secondary to this right
> knee impairment that required a cane or ambulatory device that would limit her
> exertionally (Exs. 3F; 5F; 11F; 14F; 20F). …
>
> Additionally, the claimant has reported that her husband and she performed the
> shopping duties and household chores together, but she also reported to her
> counselor that she resumed her counseling sessions to manage the stresses of having
> to care for her husband as he recuperated from his cancer diagnosis and take care
> of their son and household (Ex. 11F, p. 14). …
>
> Significantly, the claimant's conservative treatment modalities have remained
> stable through the date of this decision.
>
> In light of claimant's type and compliance with her treatment modalities and her
> reported increased activities of daily living in response to her husband's health
> issues, the undersigned finds that the chronic effects of the claimant's surgically-
> treated right knee, fibromyalgia, and the combined effects of the claimant's
> otherwise nonsevere impairment of obesity have restricted her to a reduced range
> of light work with additional nonexertional physical limitations.

(Tr. 20-21 (emphasis added).)

Ms. Mott contends that this finding was in error because "the combination of her knee

problems and obesity would have limited her to less than work at the light level."  (ECF Doc. 15

p. 13.)  In support of this argument, she points to her neurologist's observation of an ataxic gait

(*id.* (citing Tr. 568)), the opinion of chiropractor Dr. Studer that she could not work due to

33

ongoing pain spasms and injuries (*id.* (citing Tr. 853)), and her own subjective reports of her symptoms and limitations (*id.* (citing function report (Tr. 315), hearing testimony (Tr. 50-52)).

With respect to her "ataxic gait," the undersigned finds for the reasons discussed above that the observation that Ms. Mott had a "generally normal" gait was supported by substantial evidence and did not mischaracterize the evidence.  With respect to Dr. Studer's opinion that Ms. Mott "cannot work @ this time" (Tr. 853), the Commissioner correctly observes (ECF Doc. 17 p. 25) that an opinion as to Ms. Mott's ability to work "is inherently neither valuable nor persuasive to the issue of whether" Ms. Mott is disabled.  20 C.F.R. § 404.1520b(c)(3)(i).  It is also noted that Dr. Studer, a chiropractor, is not an acceptable medical source for purposes of rendering a medical opinion under SSA regulations.  20 C.F.R. § 404.1502.

Finally, with respect to Ms. Mott's subjective statements regarding her limitations, the ALJ was not required to accept her subjective allegations as true or incorporate them into the RFC.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints.")  Here, the ALJ concluded that Ms. Mott's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 19.)  For the reasons set forth in Section VI.D., *infra*, the undersigned finds that Ms. Mott has failed to demonstrate that the ALJ erred in reaching this conclusion.

A review of the ALJ's decision reflects that he found Ms. Mott capable of a reduced range of light work after first considering the treatment records for her knee impairments, her other impairments (including obesity), and her reported activities of daily living.  (Tr. 20-21.)  As the Commissioner observes (ECF Doc. 17 pp. 24-25), the ALJ also considered the opinions of the state agency medical consultants, who opined that Ms. Mott had the RFC to perform light

exertional work (Tr. 76, 94), and found those opinions persuasive.  (Tr. 21.)  Ms. Mott did not explicitly challenge the ALJ's finding that the opinions were persuasive in her appeal, therefore waiving any such argument.  The undersigned finds that the evidence and opinions discussed and relied upon by the ALJ in his Step Four analysis supply substantial evidence to support his finding that Ms. Mott was capable of performing light exertional work.

Ms. Mott challenges the ALJ's reliance on the state agency opinions in her reply brief, arguing that the state agency consultants' opinions "were made prior to receipt of the records documenting arthroscopic knee surgery on both the right knee . . . and left knee." (ECF Doc. 18 p. 2.)  She also argues in her reply that "[t]he documented surgeries, submitted after the State Agency reviews, provided substantial evidence to support her testimony that she was unable to stand/walk the requisite 6 hours per day for work at the light level of exertion." (*Id*.)

The undersigned notes that caselaw under prior regulatory standards provides that medical opinions need not be based on the complete evidentiary record, but should be supported by evidence.  *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1002 (6th Cir. 2011).  Where significant weight was given to a source who had not reviewed the entire record, the Sixth Circuit advised the ALJ should "give 'some indication' that he 'at least considered' that the source did not review the entire record." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 632 (6th Cir. 2016); *see also Blakley*, 581 F.3d at 409 (indicating there must be "some indication that the ALJ at least considered" later medical records when greater weight was given to "an opinion that is not 'based on a review of a complete case record'") (quoting *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007)).  While this caselaw is not strictly applicable under new regulatory standards, the general concepts are nevertheless appropriately considered here.

In this case, the initial state agency medical consultant opinion in March 2019 (Tr. 76-77) was based on a review of treatment records for Ms. Mott's knees through February 2019, with findings of bilateral knee pain, crepitus, tenderness, and effusion (Tr. 72-73).  The opinion on reconsideration in July 2019 (Tr. 94-95) considered additional records, but no new records from Ms. Mott's orthopedic provider (Tr. 90-91).  While the consultants did not consider Ms. Mott's knee surgery in rendering their opinions, they did consider her symptomatic knee impairment. More importantly, the ALJ explicitly considered the fact that Ms. Mott's knee impairment did not resolve with conservative treatment, requiring surgery.  (Tr. 14, 20.)

As to whether the mere fact that Ms. Mott underwent knee surgery required a reduction in her exertional level, a review of the records reveals that she reported no pain or discomfort at a post-operative visit following her right knee arthroscopy, and was observed to have a full range of motion with no effusion.  (Tr. 1025.)  Her post-operative records for her left knee surgery show similar results.  (Tr. 1026.)  In her hearing testimony, Ms. Mott stated that her ability to go up and down stairs actually improved in since her surgery.  (Tr. 51.)  She also testified that she was able to walk up to a mile on some days.  (*Id.*)  This evidence, in addition to the ALJ's observations regarding Ms. Mott's treatment and activities of daily living, is consistent with the ALJ's finding that later-submitted evidence concerning her knee surgeries did not necessitate further limitations in her exertional abilities, including her ability to stand and walk.

While the state agency medical consultants did not have Ms. Mott's surgical records before them when they found her capable of light exertional work, it is clear that the ALJ considered and made his final RFC decision based on the totality of the evidence submitted at the hearing level, and appropriately found that the state agency medical consultants' opinions

"remain[ed] consistent with the totality of the medical and non-medical evidence provided through the date of [the] decision."  (Tr. 21.)

Ms. Mott argues that the complete record "support[s] her testimony that she was unable to stand/walk the requisite 6 hours per day for work at the light level of exertion."  (ECF Doc. 18 p. 2.)  But the question before this Court is not whether substantial evidence supports Ms. Mott's claimed limitations.  Even if Ms. Mott could show that a preponderance of evidence supported more restrictive exertional limitations, this Court cannot overturn the Commissioner's decision so long as "substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  The undersigned finds that the ALJ was supported by substantial evidence in assigning light exertional RFC limitations at Step Four

For the reasons set forth above, the undersigned concludes that Ms. Mott has not met her burden to demonstrate that the ALJ did not properly consider her knee impairments in combination with her obesity at Steps Three and Four, and has further failed to demonstrate that the ALJ lacked substantial evidence to support his related Listings and RFC findings.

### 2. Whether ALJ Erred in Determining Mental Health Impairments Did Not Satisfy a Listing

Ms. Mott next argues that the ALJ erred at Step Three when he found Ms. Mott did not satisfy the criteria of Listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety disorders).[5]  (ECF Doc. 15 pp. 14-15.)  The Commissioner responds that the ALJ's findings with respect to the mental listings were supported by substantial evidence.  (ECF Doc. 17 p. 23.)

---

[5] Ms. Mott also challenges the ALJ's consideration of Listing 12.15 (ECF Doc. 15 p. 14), but a review of the ALJ's decision reveals that he did not classify post-traumatic stress disorder as a severe impairment (Tr. 12) and accordingly did not discuss Listing 12.15 at Step Three (Tr. 17-18).

At Step Three of the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii).  The claimant bears the burden of establishing that her condition meets or equals a Listing.  *Johnson v. Colvin*, No. 1:13CV-00134-HBB, 2014 WL 1418142, at *3 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d); *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)).  Furthermore, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 Fed. App'x 725, 728 (6th Cir. 2004).

Listings 12.04 and 12.06 deal with depressive, bipolar and related disorders (12.04) and anxiety and obsessive-compulsive disorders (12.06).  20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.04, 12.06.)  Both of these Listings incorporate identical paragraph B and paragraph C criteria, which is an analysis used to rate the severity of mental impairments in four general areas of functioning at Steps Two and Three of the sequential evaluation process.  20 C.F.R. §§ Pts. 404, 416.  Paragraph B defines four broad mental functional areas: "Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself," and requires that a claimant show extreme limitation in one area, or marked limitation in two areas in order to meet a listing.  20 C.F.R. § 404.1520a(c)(3), *see also* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00E.  As Ms. Mott's argument is focused on the "B" criteria, those are the criteria that will be addressed herein.

Ms. Mott contends that the ALJ erred in finding she had mild to moderate limitations in her ability to understand, remember or apply information, interact with others, concentrate, persist or maintain pace, and adapt or manage herself.  (ECF Doc. 15 pp. 14-15.)   The

Commissioner argues the ALJ's analysis was supported by the opinions of the consultative psychiatric examiner and state agency psychological consultants. (ECF Doc. 17 pp. 22-23.)

Notably, the inquiry required here is whether the ALJ's findings were supported by substantial evidence, not whether the evidence could possibly support greater impairment. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess: 'If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.'") (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).

The ALJ in this case provided a detailed analysis in support of his findings regarding Ms. Mott's level of limitation in each of the "B" criteria functional areas, with citations to specific evidentiary support for each finding, as follows:

> In *Listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety disorders)* The severity of the claimant's mental impairments, considered separately and in combination, does not meet or medically equal the criteria of Listings 12.04 and 12.06.
>
> The claimant has been diagnosed with depression and anxiety, which have satisfied the "paragraph A" of Listings 12.04 and 12.06 (Exs. 3F, pp. 6-7, 11; 14F, pp. 6, 11). Dr. Parikh has opined that the claimant's anxiety was associated with her chronic headaches, but it was responding amelioratively to Klonopin without any evidence of abuse (Ex. 14F, p. 6). Treatment notes from Dr. Parikh, the claimant's primary care physician Digna Moya, M.D., and counseling notes from Psychological and Behavioral Consultants indicate that the claimant's anxiety has required both medication and counseling, but her depression has occasionally manifested chronically with family stressors, including her husband's cancer (Exs. 3F, pp. 6-11; 11F, pp. 14, 22, 43, 56; 14F, pp. 6, 11; 8F, pp. 1-5).
>
> In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied . . .
>
> In understanding, remembering or applying information, the longitudinal effects of the claimant's mental impairments have caused her mild limitations. Based on

normal cognitive functioning at Dr. Parikh's examinations and at the State Agency-requested consultative psychological examination with Jeffrey Rindsberg, Psy.D., on February 23, 2019, the claimant has not manifested any objective signs of cognitive deficits that would be consistent with fibro fog (Exs. 8F, p. 5; 14F). In fact, Dr. Rindsberg opined that the claimant's cognitive functioning was in the above average intellectual range (Ex. 8F; *see generally* Ex. 1A, p. 10). The claimant has had headaches, but these have responded amelioratively to ongoing treatment according to the claimant's comments to Dr. Parikh (Ex. 14F, pp. 2, 6; *see also* Ex. 3F, p. 8). Based on their review of the longitudinal evidence, the State Agency psychological consultants opined that the claimant's mental functioning secondary to her depression and anxiety was slightly more restrictive than Dr. Rindsberg opined, but still only at the mild level in light of her ameliorative response to medication for anxiety and depression and counseling services for anxiety, which she resumed in late 2018 in response to her family stressors (Exs. 11F; 14F). Accordingly, the undersigned finds that the longitudinal effects of mental impairments have caused her mild limitations in this functional area.

In interacting with others, the longitudinal effects of the claimant's mental impairments have caused her moderate limitations. Based on their assessment of the claimant's need and ameliorative response to psychotropic medication for anxiety and depression and her resumption of counseling services for acute exacerbations of her anxiety secondary to family stressors, the State Agency psychological consultants opined that the treated effects of the claimant's mental impairments caused her moderate limitations, which is more restrictive than Dr. Rindsberg's observations (Exs. 1A, p. 13; 3A, pp. 14, 15). The undersigned finds the State Agency psychological consultants' mental assessments are supported by and consistent with treatment notes from Dr. Moya and Dr. Parikh establish the ameliorative effects of the claimant's compliance with her mental health treatment modalities (Exs. 3F; 11F; 14F). Accordingly, the undersigned finds the longitudinal effects of mental impairments have caused her moderate limitations in this functional area.

With regard to concentrating, persisting or maintaining pace, the longitudinal effects of the claimant caused mild limitations. Dr. Rindsberg opined that the claimant had no limitations in this functional area (Ex. 8F). Similarly, based on their longitudinal review of the evidence through the reconsideration determination level, State Agency psychological consultants opined that the claimant's mental impairments did not have any limitations with sustained concentration and persistence (Exs. 1A, p. 13; 3A, p. 14). Based on the totality of the evidence, the claimant's ameliorative response to ongoing prescribed outpatient mental health treatment, the undersigned finds that effects of the claimant's mental impairments have caused her mild limitations in this functional area.

As for adapting or managing oneself, the longitudinal effects of the claimant caused moderate limitations. In light of the claimant's ameliorative response to counseling

services previously for her anxiety, the claimant resumed counseling services in late 2018 to help her manage her acute exacerbations secondary to her husband's cancer diagnosis, the family financial stressors, and her need to assume primary responsibility for their son and their household (Ex. 11F, pp. 14, 22, 56). Accordingly, the undersigned finds that effects of the claimant's metal impairments have caused her moderate limitations in this functional area.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

(Tr. 17-18.)

Ms. Mott argues that the above analysis was not supported by substantial evidence because the ALJ did not acknowledge specific mental status examination findings from LISW Mizen in December 2018, February 2019, and April 2019, noting that Ms. Mott appeared disheveled, fatigued, had a slow thought process, lost track of conversation, had several anxiety attacks, and had a sad, depressed, and anxious mood.  (ECF 15 p. 14 (citing Tr. 964-66, 985-87, 1006-8).)  First, the undersigned observes that LISW Mizen noted the relevant findings during three therapy sessions where Ms. Mott sought treatment in connection with increased stressors that included her husband's cancer diagnosis and treatment.  (Tr. 969, 990, 1011.)  The undersigned further observes that the ALJ explicitly acknowledged that the records for the same three therapy sessions demonstrated Ms. Mott's occasional worsening due to family stressors. (Tr. 17 ("Treatment notes from Dr. Parikh, the claimant's primary care physician Digna Moya, M.D., *and counseling notes from Psychological and Behavioral Consultants* indicate that the claimant's anxiety has required both medication and counseling, *but her depression has occasionally manifested chronically with family stressors, including her husband's cancer.*") (citing Tr. 969 (12/8/18 therapy visit), 977 (same), 998 (2/16/19 therapy visit), 1011 (4/20/19 therapy visit)) (emphasis added).)

41

As a general matter, the ALJ was not required to discuss the details of every treatment record, so long as his decision reflected that he considered the evidence as a whole and reached a reasoned conclusion.  *See Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) (finding an ALJ is not "required to discuss each piece of data in [his] opinion, so long as [he] consider[s] the evidence as a whole and reach[es] a reasoned conclusion") (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (citation omitted)).  Given that the ALJ explicitly considered the relevant therapy records, and acknowledged that the records showed her depression "occasionally manifested chronically with family stressors" (Tr. 17), the undersigned is unable to conclude based on the ALJ's failure to detail the specifics of these findings that the ALJ lacked substantial evidence to support his mental impairment Listings analysis.

Although it is Ms. Mott's burden to demonstrate that the ALJ lacked substantial evidence to support his findings at Step Three, the undersigned notes that the ALJ's findings with respect to the mental Listings were well supported by the objective findings and treatment records of consultative examiner Jeff Rindsberg, Psy.D., primary care provider Digna Moya, M.D., neurologist Sanjay Parikh, M.D., and therapist Christine Mizen, LISW, as well as the professional opinions of the state agency psychological consultants, as set forth in further detail in the ALJ's decision.  (*See* Tr. 17-18 (citing records).)

For the reasons described above, the undersigned finds that the ALJ's Step Three findings regarding Listings 12.04 and 12.06 were supported by substantial evidence, and that Ms. Mott has not met her burden to establish otherwise.

42

### 3.    Whether ALJ Properly Evaluated Headaches Under SSR 19-4p

Ms. Mott next asserts that the ALJ erred in failing to analyze her headaches as required by SSR 19-4p, which provides "that headaches should be considered as equaling listing 11.02." (ECF Doc. 15 pp. 16-17; ECF Doc. 18 pp. 1-2.)  Specifically, she argues that the ALJ erred by failing to find based on the self-reported severity and frequency of her headaches "that [she] equaled Listing 11.02 A or B."  (ECF Doc. 15 p. 16.)  She also argues that the ALJ improperly focused on the fact that she stopped taking her headache medication, when she stopped taking it due to side effects.  (ECF Doc. 18 pp. 1-2.)  The Commissioner responds that the ALJ properly evaluated headaches under SSR 19-4p, properly concluded that Ms. Mott's headaches were controlled with medication, and was not required to accept Ms. Mott's subjective claims regarding the frequency of her headaches.  (ECF Doc. 17 pp. 21-22.)

SSR 19-4p provides guidance on how "primary headache disorders" such as migraines, tension-type headaches, trigeminal autonomic cephalalgias / cluster headaches are established and evaluated.  *See* SSR 19-4p, 84 Fed. Reg. 44667, 44667-71 (Aug 26, 2019).  SSR 19-4p explains that: "While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing."  *Id.* at 44671. SSR 19-4p then addresses the requirements of Paragraph B of listing 11.02 as follows:

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in

43

> functioning that may be associated with the primary headache disorder or effects of
> its treatment, such as interference with activity during the day (for example, the
> need for a darkened and quiet room, having to lie down without moving, a sleep
> disturbance that affects daytime activities, or other related needs and limitations).

84 Fed. Reg. 44667, 44671.

Here, the ALJ identified "migraine or tension headaches" as a severe impairment at Step

Two.  (Tr. 12.)   At Step Three, the ALJ evaluated whether Ms. Mott's "primary headache

disorder, in this case, migraine headaches, alone or in combination with another impairment,

medically equals a listing, for example, Listing 11.02."  (Tr. 16.)  After evaluating her headaches

at this step, the ALJ concluded that the impairment did not equal Listing 11.02B or 11.02D.  (Tr.

16-17.)  In support of this determination, he noted Ms. Mott "has responded to medication

according to treatment notes from Dr. Parikh" (Tr. 16 (citing Tr. 1070 (5/20/19 neuro; "Patient is

here for follow up for migraines. Patient states no changes and medication is effective.")) and

considered "the claimant's neurological functioning" in finding "that no acceptable medical

source has determined that the longitudinal effects of the claimant's headaches have medically

equaled Listing 11.02" (Tr. 17 (citing Tr. 1070 (same as above), 1075 (11/20/19 neuro; "Patient

is here today for a follow up for migraines stating medication is effective refills are needed."),

1078 (11/20/19 neuro; normal neurological examination; diagnosis of tension headaches).)

Ms. Mott challenges these findings, arguing that the ALJ failed to analyze her headaches

and should have found that she equaled Listing 11.02B based on the following evidence:

> On August 20, 2018, Dr. Parikh related that [Ms.] Mott was having more severe
> headaches more often (Tr. 570). Cleveland Clinic and Dr. Moya indicated that she
> was being treated for migraine without status migrainosus (Tr. 927, 940). At the
> hearing, [Ms.] Mott testified that she had a migraine once a week (Tr. 55).

(ECF Doc. 15 p. 16.)  With respect to the first piece of evidence, her complaints to Dr. Parikh of

"more severe headaches" in August 2018, it is observed that this record contains no information

44

regarding the frequency of her headaches, and reflects simply that she was initiated on medication to address worsening headaches. (Tr. 570-73.) With respect to the second pieces of evidence, reflecting Dr. Moya's migraine diagnosis, the undersigned notes that the December 2018 primary care record reflected only that Ms. Mott was treating with neurologist Dr. Parikh for migraines, and was "[d]oing well at th[at] time." (Tr. 938-41.) Similarly, the April 2019 primary care record indicated only that she followed with Dr. Parikh for migraines, with a review of symptoms negative for headaches. (Tr. 927-29.) The mere fact that Ms. Mott was diagnosed with migraines is insufficient to establish that she met a Listing under SSR 19-4p. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (indicating a diagnosis alone "says nothing about the severity of the condition"); *Vidot v. Colvin*, No. 1:14 CV 1343, 2015 WL 3824360, at *7 (N.D. Ohio June 18, 2015) ("[T]the mere diagnosis of an impairment in a Listing does not mean a claimant meets the Listing.") (internal citations omitted). It is also observed that Dr. Parikh's treatment records diagnose "tension headaches" as opposed to migraines. (Tr. 569, 573, 1078.)

With respect to the third record identified by Ms. Mott, her own testimony regarding the frequency of her headaches, it is again observed that the ALJ was not required to accept her subjective allegations as true. *See Jones*, 336 F.3d at 476. Not only did the ALJ conclude that Ms. Mott's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record" (Tr. 19), he explicitly based his SSR 19-4p finding on the fact that "no acceptable medical source" had determined that the effects of Ms. Mott's headaches medically equaled the Listing (Tr. 17). Ms. Mott has certainly not identified findings by any of her medical providers that would establish or support the "frequency of headache events" or "limitations in functioning" necessary to meet the Listing under SSR 19-4p. *See* 84 Fed. Reg. 44667, 44671.

45

In her reply brief, Ms. Mott argues that the fact that she reported that her medication was effective did not mean she was no longer having migraines.  (ECF Doc. 18 pp. 1-2.)  This argument is neither here nor there.  The question is not whether she was diagnosed with migraines, and it is not whether she ever had a migraine while taking medication.  The question addressed by the ALJ in his analysis of Ms. Mott's headaches at Step Three was whether her headaches matched the frequency, severity, and unresponsiveness to treatment detailed in SSR 19-4p and Listing 11.02B.  The ALJ found that the medical records did not support such a finding in this case, and Ms. Mott has not presented evidence or argument demonstrating that this finding was in error.  Incidentally, it is noted that Ms. Mott reportedly took the prescribed headache medication for two weeks (Tr. 566, 573), and thereafter seems to have ceased her complaints regarding migraines despite the fact that no new headache medications were prescribed (Tr. 566, 1074, 1078).  This is consistent with her testimony at her hearing that her pain medications were limited to Tylenol and a topical anti-inflammatory. (Tr. 50.)

For the reasons set forth above, the undersigned finds Ms. Mott has not met her burden to demonstrate that the ALJ erred in finding her headaches did not rise to listing level severity.  The ALJ appropriately evaluated her headaches under the applicable standards, and his finding that her headaches did not equal Listing 11.02B or D was supported by substantial evidence.

### 4.    Whether ALJ Properly Evaluated Fibromyalgia Under SSR 12-2p

Ms. Mott also asserts that the ALJ "failed to properly consider the effects of [her] fibromyalgia as required by SSR 12-2p."  (ECF Doc. 15 pp. 15-16; ECF Doc. 18 pp. 1-2.)  The Commissioner responds that the ALJ "appropriately analyzed the evidence of Plaintiff's fibromyalgia as required by SSR 12-2p" and "reasonably found that Plaintiff's fibromyalgia did not equal a listing."  (ECF Doc. 17 pp. 20-21.)

SSR 12-2p provides guidance on how the SSA "develop[s] evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how [the SSA] evaluate[s] fibromyalgia." *See* SSR 12-2p, 77 Fed. Reg. 43640-44 (Jul. 25, 2012).  SSR 12-2p explains that there are two methods for determining whether an individual has a medically determinable impairment of fibromyalgia.  (*Id*. at 43641.)  Each method requires a showing a widespread pain and evidence that other disorders that could cause the signs or symptoms have been excluded. (*Id*.)  The difference between the two methods is that one looks to the existence of tender points and the other looks to "[r]epeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome."  (*Id*. (footnotes omitted).)  SSR 12-2p further explains that fibromyalgia cannot meet a listing at Step Three because it is not a listed impairment.  (*Id*. at 43644.)  Therefore, at Step Three, the SSA "determine[s] whether [fibromyalgia] medically equals a listing . . ., or whether it medically equals a listing in combination with at least one other medically determinable impairment."  (*Id*.)

Consistent with the procedures laid out in SSR 12-2p, the ALJ found Ms. Mott's fibromyalgia to be a severe impairment at Step Two, explaining:

> [S]ince the evidence fails to establish the required 11 out of 18 tenderpoints for fibromyalgia, the undersigned has considered the treated non-severe effects of gastroesophageal reflux, irritable bowel syndrome, anxiety, depression, restless leg syndrome, and fatigue as co-occurring conditions to establish the medically-determinable nature of her fibromyalgia/chronic pain syndrome mentioned in treatment notes from the claimant's neurologist Sanjay Parikh, M.D.

(Tr. 12-13.)  At Step Three, the ALJ then considered whether Ms. Mott's fibromyalgia and co-occurring conditions satisfied the medical equivalency standard of the Listings, explaining:

> Although the claimant has repeatedly reported chronic pain and these co-occurring conditions, the undersigned notes as well that, on November 19, 2018, the claimant

47

reported to Dr. Parikh that she stopped taking the medication for her tension/migraine headaches and mandibular joint pain and muscle pain in her hands despite its ameliorative effect (Ex. 14F, p. 2). As discussed, the claimant's gastrointestinal discomfort responded to Nexium to the point that she reported that she only had to take "sparingly" (Ex. 3F, p. 11). As will be discussed, the claimant's depression and anxiety had partially resolved with her compliance with Lexapro and Klonopin and her resumption of counseling services (Exs. 14F, p. 6; see also Ex. 11F, pp. 22, 43, 56; 8F, p. 5).

Based on the treated effects of the claimant's fibromyalgia and co-occurring conditions have imposed significant functional limitations, but not in a manner that would satisfy the medical equivalency standard of the Listings set forth in SSR 12-2p and SSR 17-2p.

(Tr. 15-16.)

Ms. Mott contends that the ALJ's rationale was faulty because "he focused on the fact that she stopped taking her medication on November 19, 2018," and "failed to read further where Dr. Parikh reported that she stopped taking the medication as it caused tingling and numbness." (ECF Doc. 15 p. 15 (citing Tr. 1066).)  She goes on to explain that "future notes indicate that [Ms.] Mott was compliant with her medication" after the medication was changed.  (*Id.* (citing Tr. 1070, 1075.)  The Commissioner notes in response that the ALJ acknowledged in his Step Three findings that Ms. Mott's "migraines were nonetheless controlled by new medications." (ECF Doc. 17 p. 21 (citing Tr. 17 (citing Tr. 1070, 1075)).)

A review of the relevant records reflects that Ms. Mott did discontinue use of Qudexy for her tension headaches after two weeks due to reported side effects, although she was instructed to see rheumatology regarding possible other etiologies for the symptoms.  (Tr. 566, 573.)  It is noted, however, that no new headache medication appears to have been prescribed at that time. (Tr. 566.)  Indeed, while the records for Ms. Mott's subsequent neurology visits indicate she was treating for migraines and her medications were effective, the records do not evidence any new prescription headache medications after Qudexy was discontinued.  (Tr. 1070-78.)  Instead, Ms.

Mott was maintained on Klonopin for RLS throughout, with either Lexapro or Effexor for anxiety.  (Tr. 569, 573, 576, 1074, 1078.)  It therefore appears the ALJ was not wholly correct in suggesting Ms. Mott stopped taking a medication for her headaches and joint/muscle pain despite its ameliorative effect.  (Tr. 15.)  Instead, she apparently stopped taking her headache medication due to side effects, but did not initiate a new headache prescription, and instead reported her medications effective despite continuing treatment with her prior prescriptions alone.

While the specific statement challenged by Ms. Mott is not entirely accurate, it is noted that the ALJ's additional observation at Step Three that Dr. Parikh had observed her headaches "responded to medication" is generally consistent with the records.  (Tr. 16 (citing Tr. 1070 ("Patient is here for follow up for migraines. Patient states no changes and medication is effective.").)  Indeed, any inaccuracy in this observation would be the failure to point out that Ms. Mott had stopped complaining of headaches and reported her medications effective even though she was not taking a prescribed headache medication.  Further, the ALJ's observation regarding the improvement of her headaches was consistent with his finding that co-occurring conditions like gastrointestinal discomfort, depression, and anxiety also responded to treatment (Tr. 15-16), and that Ms. Mott's "conservative treatment modalities have remained stable through the date of this decision" (Tr. 20).  In this context, the undersigned finds the ALJ's misstatement regarding Ms. Mott's reasons for discontinuing her only headache prescription does not mischaracterize the record in a way that undermines the accuracy or logic of his findings regarding fibromyalgia at Step Three, and is therefore harmless error.  *See Sickinger v. Comm'r of Soc. Sec.*, No. 1:21-CV-327, 2022 WL 708195, at *14 (N.D. Ohio Feb. 24, 2022) ("although the ALJ's explanation was not perfect, it is capable of meaningful judicial review" (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006) (citing *Fisher v.*

*Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (citation omitted) as stating, "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result."), *report and recommendation adopted Sickinger, v. Comm'r of Soc. Sec.*, No. 1:21CV327, 2022 WL 704582 (N.D. Ohio Mar. 9, 2022).

Ms. Mott also argues broadly that the ALJ would have found that her combination of pain and other fibromyalgia symptoms precluded full time competitive work if he had "properly reviewed the record."  (ECF Doc. 15 p. 16.)  The Commissioner points out in response that Ms. Mott "points to no objective evidence of her fibromyalgia in her brief that demanded a finding from the ALJ that she medically equaled a listing."  (ECF Doc. 17 pp. 20-21.)  The undersigned concurs that Ms. Mott has failed to demonstrate that the combination of her fibromyalgia and co-occurring conditions rose to a listing level of severity.  While acknowledging that Ms. Mott's co-occurring conditions supported classification of fibromyalgia as a severe impairment, the ALJ correctly noted that those conditions were treated with medications that remained largely static throughout the record, and did not support a level of limitation that would satisfy the medical equivalency standard of the Listings.  (Tr. 15-16.)  This finding is consistent with the medical records, and Ms. Mott has offered neither evidence nor argument to demonstrate that the medical equivalency standard was met.

For the reasons set forth above, the undersigned finds that the ALJ decision effectively sets forth the basis for his findings regarding fibromyalgia at Step Three, and Ms. Mott has not met her burden to show that those findings were unsupported by substantial evidence.

**D.**     **Third Assignment of Error: Whether ALJ Properly Evaluated Subjective Allegations Regarding Symptoms**

In her final assignment of error, Ms. Mott challenges the ALJ's evaluation of her subjective allegations under SSR 16-3p, arguing that he failed to provide a coherent explanation and specific reasons as to why he found her subjective complaints inconsistent with the medical evidence, and failed to properly consider her disabling pain.  (ECF Doc. 15 pp. 19-23.)  The Commissioner argues that the ALJ was not required to accept Ms. Mott's subjective allegations, and reasonably concluded that Ms. Mott's subjective reports were not entirely supported by the evidence. (ECF Doc. 17 pp. 21, 23, 25-26.)

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability."  *Jones v.* 336 F.3d at 476; *see also Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL 4459700, *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, 81 Fed. Reg. 14166 (March 16, 2016) (republished as 82 Fed Reg. 49462 (Oct. 25, 2017) as to applicable date and to update citations to reflect revisions to regulations effective March 27, 2017)) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).  An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

51

SSR 16-3p rescinded and superseded SSR 96-7p, and eliminated "the use of the term 'credibility' from [the SSA's] sub-regulatory policy," because the "regulations do not use this term."  SSR 16-3p, 82 Fed Reg. 49462, 49463.  The revised regulations clarify "that subjective symptom evaluation is not an examination of an individual's character."  *Id*.  Rather, when determining "whether an individual's symptoms will reduce his or her corresponding capacities to perform work-related activities . . . the *consistency* of the individual's own statements" is considered.  *Id*. at 14170 (emphasis added); *see also Banks v. Comm'r of Soc. Sec.*, No. 2:18-cv-38, 2018 WL 6060449, *5 (S.D. Ohio Nov. 20, 2018) ("SSR 16-3p requires the ALJ to evaluate the consistency of a plaintiff's statements, without reaching the question of overall credibility, or character for truthfulness"), *report and recommendation adopted*, 2019 WL 187914 (S.D. Ohio Jan. 14, 2019).  SSR 16-3p did not change the "two-step process" that an ALJ uses "when assessing the limiting effects of an individual's symptoms." *Martin v. Kijakzi*, No. 1:20-CV-117, 2021 WL 4066985, *5 (E.D. Tenn. Sept. 7, 2021); *see also Hoffman v. Comm'r of Soc. Sec.*, No. 1:20-cv-138, 2021 WL 4145626, *5 (W.D. Mich. Sept. 13, 2021) (explaining SSR 16-3p did not change the longstanding two-part analysis for evaluating symptoms).

Under the two-step process to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a))*.*  If that requirement is met, the second step is to evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  When the alleged symptom is pain, the ALJ should evaluate the

52

severity of the alleged pain in light of all relevant evidence, including the factors set out in 20

C.F.R. § 404.1529(c).  *See Felisky v. Bowen*, 35 F.3d 1027, 1038-1039 (6th Cir. 1994).  Factors

relevant to a claimant's symptoms such as pain include daily activities, types and effectiveness

of medications, treatment received to address symptoms, and other factors concerning a

claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 16-3p, 82

Fed Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3).  There is no dispute that the first step

is met in this case, so the discussion herein will focus on the second step.

Ms. Mott contends that the ALJ failed "to properly consider [her] disabling pain and the

fact that it would likely result in her inability to sustain and/or maintain attention and

concentration," and failed to provide a "coherent explanation" or "specific reasons" as to why he

found her testimony regarding symptoms inconsistent with the record.  (ECF Doc. 15 p. 22.)  On

the contrary, the record reflects that the ALJ explicitly noted his consideration of SSR 16-3p

factors that included daily activities, type and effectiveness of medications, and treatments to

address symptoms (Tr. 19-20 (citing SSR 16-3p)), and provided specific supporting examples.

In particular, the ALJ noted that Ms. Mott had undergone knee surgery after conservative

treatment failed, but did not require an ambulatory device.  (Tr. 20 (citing records).)  He noted

that MRI imaging of her spine identified bulges following a motor vehicle accident, but that her

treatment records did not establish any new musculoskeletal conditions that exacerbated her

fibromyalgia or migraine pain.  (*Id.*)  He noted that she complained of hand numbness, but that

there were no records establishing an extraordinary medical condition for which she needed

additional treatment.  (*Id.*)  The ALJ noted that the state agency medical consultants did not find

evidence to support manipulative functioning limitations following the accident, which he found

to be consistent with the medical evidence.  (*Id.*)  He noted that Ms. Mott reported doing

53

shopping and household chores with her husband, and later reported having to care for her husband as he recuperated from cancer, in addition to caring for her son and household.  (*Id.*)  He found it significant that Ms. Mott's conservative treatment modalities remained stable through the date of the decision.  (*Id.*)  With respect to her mental impairments, the ALJ noted her "improved response to relatively stable outpatient treatment modalities."  (Tr. 21.)

After specifically identifying each of the above factors, the ALJ found "[i]n light of the claimant's type and compliance with her treatment modalities and her reported increased activities of daily living in response to her husband's health issues" that Ms. Mott was capable of performing work related activities within the limitations specified in the RFC.  (Tr. 20-21.)  Clearly, the ALJ did not simply use boilerplate language to explain why he found that her subjective allegations not entirely credible.  The undersigned accordingly finds that Ms. Mott's vague and conclusory arguments do not meet her burden to demonstrate that the ALJ did not sufficiently explain his reasons for finding her subjective allegations less credible.

With respect to Ms. Mott's more specific argument that the ALJ failed to consider the effect of her pain on her ability sustain or maintain attention and concentration, the undersigned notes that the ALJ explicitly noted she had "not manifested objective signs of cognitive deficits that would be consistent with fibro fog" in Dr. Parikh's mental status examinations or Dr. Rindsberg consultative evaluation. (Tr. 17 (citing Tr. 849, 1065-78.)  This finding was consistent with both the objective examination findings he cited (*id.*) and the opinions of the state agency psychological consultants (Tr. 18 (citing Tr. 78, 96)).

For the reasons stated above, the undersigned finds that Ms. Mott has failed to meet her burden to demonstrate that the ALJ erred in his evaluation of her subjective complaints.  The

ALJ properly considered and weighed Ms. Mott's subjective allegations against the other evidence in the record, and applied RFC limitations that were supported by substantial evidence.

### VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

April 18, 2022

/s/ Amanda M. Knapp
_____
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).